Before we get started, let's talk about a little housekeeping. Now you all are just, nobody's splitting time with you all. It's the other side that's gonna split time, right? Or just one of you gonna argue over there as well? You're both gonna argue? How about your side? We're both arguing too. Okay, and how are you splitting it? With the court's permission, I was going to spend nine minutes on the sole issue raised by my client, which is the Protect Our Communities Foundation on the Migratory Bird Treaty Act issue, which is the only issue we've raised on the repeal. Okay. And my colleague will spend his 11 minutes on what he chooses to. And then it would, if possible, I'd like to reserve a minute of my nine minutes for rebuttal if we're able to accomplish that. Keep track of your time, but that would be a splendid idea. Okay, very well. And I mean, so you folks are splitting your time, and how are you splitting your time? I would use the first 17 minutes or so. Okay, very well. Please proceed, counsel. The Administrative Procedure Act... Can you identify yourself, please? Oh yes, I'm sorry. Sorry. I'm Eric Lichtenstein, counsel on behalf of the plaintiff's appellant, Protect Our Communities Foundation. Okay. And again, the sole issue that we've raised on appeal is the question as to compliance with the Migratory Bird Treaty Act, and more specifically, whether or not we have a cognizable claim under the compliance with the Migratory Bird Treaty Act, which I'll refer to as the MBTA, with the court's permission, to save time. The Administrative Procedure Act, as the court knows, provides for judicial review and authorizes courts in exercising that review to set aside federal agency action, which is arbitrary, capricious, and abusive discretion, or not in accordance with law, as well as agency action which has not been pursued in compliance with procedure. In this case, we have a situation, at least from plaintiff's standpoint, in which the government has, in effect, acknowledged that the project, as authorized, will operate in violation of a federal law, the MBTA, and let me explain why we believe the government has essentially locked itself into that position. The government has acknowledged point-blank, and this is in footnote seven of page 36 of their brief, that the operation of wind power projects, when operated, and we're talking not about your mom and pop's windmills, just to be clear about this, we're talking about massive industrial wind power. I'm sure your others have seen it. We've all been to Palm Springs. You see these projects, these are taller than the size of a football field, massive spinning turbines, they reach up to 200 miles per hour at the tip of the turbine spin, and when they're in place, where birds are present, the government has acknowledged, and it seems undeniable, particularly based on this administrative record, our experience with other wind power projects, that migratory birds will be killed. There may be question as to whether a particular project will kill more or less birds, but they will be killed, and the government... Counsel, let me ask you this, because we don't have a whole lot of time, my understanding of the government's argument on this point is that they, they're not authorizing this. They're saying that, I don't know, did they say it, Thule Wind, is that the correct way? Okay, that Thule Wind has the right now to file for a permit, that the government itself is not going to operate these turbines, it's not going to do any of these kills. You know, you've got the NEPA claim, it's a separate issue, but they said we've analyzed this, we've looked at all this, and we have a process, and we think there's a way that Thule could probably do this, but we're not given a permit to do this. This is a separate issue. So we're talking about a framework within which a permit could be applied for. So they're saying, if I understand it correctly, we're not killing any birds. We're not putting up any great big propellers. Thule may, and when they apply for a permit, we're going to have to look at it at that time, but right now, we're not authorizing this. What's your response to that? Your Honor, the answer is that, in fact, they are authorizing it. They have issued a right-of-way to construct this project on federal land, and 112,000 acres of federal land, and just to be clear about that, so this is not a private party project that could be done with an incidental or no federal way. Let me understand what you're saying here. The fact that they've said that you can use this right away when you get a permit doesn't mean that they're using it without a permit, right? In other words, right now, as authorized, if you weren't challenging it, they would still have to go through a permitting. Thule would have to go through a permitting process to put anything in, wouldn't they? That's not correct, Your Honor. Okay, tell me why. They have authorization, and the right-of-way begins at the government supplemental excerpts of the record. It's confusing. We have multiple excerpts, but it's the government supplemental experts at page 490, which sets forth the approval, the final federal approval to construct this project on federal land in accordance with the terms of that right-of-way. It has a hundred and ten... But it says you have to be in compliance with all federal, state, and local laws, does it not? It says that in a generic sense, and... How do we know generic? It's part of the condition. But let me, because I think this is the, and I appreciate, Your Honor, getting to what we think is the absolute nub of this. That's our job. And I'll try to make it my job to provide a reasonable answer. And that is, unlike other parts of federal law, where they were quite explicit about saying, for the Endangered Species Act, you must comply with the following terms in the biological opinion. National Historic Preservation Act, you must comply and get a permit and an authorization under that statute. Clean Water Act, Clean Air Act, same thing. When it came to the Migratory Bird Treaty Act, although they could have said, and would have said, if they were operating the way Your Honor has suggested, go and get a permit under the Migratory Bird Treaty Act before you operate this project, they didn't say that. In fact, not only did they not say that, but they conditioned operation of the project on two very different things that related to bird impacts that are not getting a permit under the Migratory Bird Treaty Act. And so if you look at the supplemental excerpts of the record, we're talking about page 505, which refers to the aviation plan. Specifically, we're talking, just to make absolutely clear about this, pages 371, 126, 465, and 504, what they actually said was, we want you to prepare an avian and bat protection plan, as well as a monitoring plan, that will monitor the birds that you're killing. And is that they will kill birds in violation of the Migratory Bird Treaty Act. But so they conditioned on doing other things, which everybody acknowledges, and the Fish and Wildlife Service itself said, this is not a surrogate for a permit under the Migratory Bird Treaty Act. So... But wouldn't they be out of compliance with federal law if they constructed and operated a wind facility that killed migratory birds? And wouldn't that be inconsistent with the condition of the approval? Well, we certainly think it would. The company, as your honors know, is taking the position that they're not required to comply with the Migratory Bird Treaty Act at all. Well, they're taking that risk, I suppose. Well, they are taking the risk. But in an APA case, the question is whether on that record, and I think this is what makes this case different from a criminal proceeding, on that record, the question is whether the agency in authorizing the position that they don't have to get an MBTA permit, and more importantly, perhaps, conditions on things that are bird-related but are not involved getting an MBTA permit, whether that is in accordance with law or in recognition of procedure required by law. And our view is, on this record, the court at least has to conclude that this is an internally inconsistent agency authorization. Let me, counsel, let me, let me say that I used to practice a lot of environmental law in the real world. And I'm used to reading a lot of material, but this case has thousands and thousands and thousands of pages. And like everything of that nature, there are internal inconsistencies. But you get down to, from my perspective, and I'm hoping you're going to help me with this, unlike, for example, the Endangered Species Act, where the agency has a statutory responsibility to you don't have that with this Treaty Act. The Treaty Act says you can't kill birds unless you have a permit. Not been proven very much. I mean, it's, the permits are pretty rare. What I read to have happened here is that after all this exhaustive study, supposed compliance with the National Environmental Policy Act, is they've said, you know, we've looked at all these things, and we're not going to take your chances the other way. We think that when you do, you've got to consider these things. But they're not authorizing it. It's not like the Fish and Wildlife Service in an ESA case. They're just saying, you've got to take all these things into consideration. We've considered it in our NEPA evaluation, but you're going to have to go from there. I feel that it's very different than an ESA. And so you have the question of what's Thule going to do? You're saying, well, they've admitted they're not going to do anything. They're just going to go ahead. Well, they're going to have to face the music if they don't get a permit, presumably, because as you say, without a permit you can't kill birds or you're in violation of the law. That's not what we're dealing with here, as I understand it. We are dealing with the situation where the government has, through an exhaustive process, has looked at all these things and laid it out and basically said, we think this is doable. We think it's doable. We want you to consider all these things. It doesn't say we'll give you a permit, but it says, we think it can be done. You're going to have to do this. You're going to have to comply with the Act. I'm picking up the treaty here. Am I missing something? What is missing from my analysis here? I just want to make sure I'm not overly encroaching on my colleague's time, but I would be happy to answer the question. Whichever one of you wants to answer it, that's fine with me. Your Honor, my answer to the question is that here they have authorized a construction operation of the project. You're saying that the right-of-way is the authorization? Oh, it absolutely is the authorization. Once you have that authorization in hand, and I think the Federal Council will have to acknowledge that. Once you have that authorization, they can go out and construct and operate this plan, this project. So they can start the operation without any further Federal approval? That's correct, Your Honor. They have final operation, final authorization. They could have said in their 110 stipulations, as they did with multiple other statutes, and I think using Your Honor's examples of many, many other statutes, that they said you have to get this permit as a precondition under the Clean Water Act, all these other statutes. They didn't say that for the Migratory Bird Treaty Act. Not only did they not say that, they included a condition which is inconsistent with that, and it's specifically condition 37 on page 505 of the Supplemental Excerpts, which it says, go and create an avian bird protection plan, which everybody acknowledges is not the permit required by the MBTA. So anyone construing this would say that's our obligation. Our obligation is not under this particular right-of-way to obtain a permit pursuant to the Migratory Bird Treaty Act. Well, it's not a permit. They've said they need to do this as part of this particular requirement, but it in no way obviates the necessity to obtain a permit if they're going to be killing birds, directly or indirectly. And they've also said, if you have one bird, you're going to have these people checking this out. If you have one bird that's killed, we're going to do this. If you have more than one bird killed, we're going to do that. That's got to be built into any permit application, I assume, because right now, as I read it, they were speaking in the abstract. They're not saying, as I understood it, you can go out right now and you can build these things. You've still got to go through all the processes. You've got to comply with federal law. You've got to comply with state law. And of course, feds and the states are all involved already in this thing. And I guess my answer, and that I would sit down and hopefully reserve time, a bit of time for rebuttal, is that here when they address the MBTA on this copious record, knowing that there would be birds killed in violation of the act, and knowing they could specifically condition it on getting an MBTA permit, they opted not to do that. And on this record, our view is that that's not in accordance with the Migratory Bird Treaty Act or the procedure required by the MBTA. What do you think they have to do first? Well, first, I think they should say explicitly, which they did for multiple other statutes, Your Honor, get a Migratory Bird Treaty Act permit before you kill birds. That's the whole purpose of the MBTA, not to wait until you've killed a bunch of them and then say, well, gee, I guess we violated the law. We'll do something about it. That's our position. Thank you, Your Honor. Good morning, Your Honor. Stephen Volker for Plaintiff's and Appellant's Backcountry Against Dumps. I would second the comments made by my colleague with regard to the Migratory Bird Treaty Act and add that there is a similar statutory scheme that is supported by regulations as well, requiring a permit for the taking of golden eagles. That is the Bald and Golden Eagle Protection Act at 16 U.S.C. section 668. I might refer the Court to the parallel provisions in the record of decision in this case. Do you agree, Counsel, that at this moment, that no birds of any type have been killed by those propellers? Not yet, Your Honor. Not yet, right. So we're dealing in the abject. You're asking us to construe all of the language in these documents to say that unless the government expressly requires that there be a permit obtained under the Migratory Bird Treaty Act and the Golden Eagle Act and so on, that the whole thing is out the window. Is that a fair statement? Almost, but let me elaborate, if I might, Your Honor. Yes, thank you. As counsel has pointed out, with respect to several other environmental statutes, the Clean Water Act, the Historic Preservation Act, the Clean Water Act, and the Endangered Species Act, the record of decision is careful to note exactly what additional permits are required in order to meet the requirements of the ROD. But conspicuously absent from this parallel provisions with regard to the Eagle Act and the Migratory Bird Treaty Act, the Bureau of Land Management, to the contrary, invited construction and operation and provided only for the preparation of an avian and bat protection plan which contemplated bird deaths and required that the mortalities be tallied up. But we feel that that's too little too late, that under the law, since under both statutes, a permit is clearly required, that the government had an obligation to tell the permittee, this is the way, these are the rules of the road. You've got to get these permits just like you have to under all these other statutes. The reason they didn't, Your Honor, is that at the time of the record of decision, the position it's now adopted, which admits that incidental take of migratory birds and golden eagles by turbans who are who are designed to generate power, they're not designed to kill birds, but incidentally they kill birds, it's admitted it's a direct impact. The government had not yet taken the position that that would be unlawful. Well let me ask you this, let's, you know, we are an appellate court, we write opinions. If we take the language that has been approved and we construe it as saying that in order to comply with all appropriate federal, state, and local laws, that before the turbines can be operated, that a permit would have to be obtained by Thule so as to be in compliance with the Migratory Bird Act and the Eagle Act and so on, would that satisfy your concerns? If that were a condition of the approval by BLM, yes, that's exactly what I'm saying. If we construe that in connection with the language of you got to comply with all these laws, that that was required, would that satisfy your concerns? I would accept that as, is that a correct reading of the law and it acknowledged that the agency had failed to address and implement those legal requirements. My time is almost up, if I might, we have... I could just follow up on Judge Smith's question. Is this the end of the road for you under the Migratory Bird Act? And what I mean is, do you have any concerns that the turbines are turned on for their failure to issue a permit or a private right of action under the Treaty Act? I don't believe we have a private right of action under the Treaty Act. You might have an APA claim against fish and wildlife. That would require a final agency action, which, if there is no agency action, let's say that there's no application for an Eagle take permit or a Migratory Bird Treaty Act permit, because as Tooley has stated previously, it doesn't believe they're required. If there's no action by Fish and Wildlife Service, there is no final agency action that the public can challenge. So I think this is the end of the road in terms of classic APA judicial review, is that this is our final opportunity to educate the agency and to enforce these vital statutes. If I might reserve some rebuttal time. Well, we'll work this out. We've asked some questions, so let's hear from the other side here, and then we'll... I know that most of the members of the audience are anxious to have a recording of this, because they're going to go to sleep tonight, and they're thinking that perhaps it might help them. Yes. Thank you, Your Honor. Not your argument, our discussion here. Thank you. May it please the Court, my name is Alan Brabender with the Department of Justice, and I'm here on behalf of the federal defendants. As this Court, I think, understands, what is that issue here is a right-of-way. It is not a decision granting Tooley Wind permission to kill birds or eagles. For its part, BLM has required Tooley Wind in operating and constructing the project to comply with all applicable laws and regulations. Counsel, I'm going to write out on the front here. Does the government concede that its intention in including language about compliance with all federal, state, and local laws, that in order to properly comply with what I'll call the Migratory Bird Act and the Eagle Act, and there perhaps are some other ones, that Tooley would have to to kill any birds? Yes. Okay. But that doesn't mean necessarily that Tooley Wind has to apply for a permit, because while there is, of course, some substantial risk that birds will be taken, it's not an absolute, and particularly with the Golden Eagle. Well, let's be realistic here. I mean, even your own study showed that that's going to happen. You know, in any studies, at least I've seen over the years, these are huge devices, and birds get killed. They just get killed. And the study that you came up with shows that certain times a day, there's a greater likelihood that they'll be killed. I know it's been moved off the tops of the mountains and down below to minimize this and so on, but I don't see any de minimis exceptions in the Migratory Bird Act. So if that's the case, then the only out is the permit, right? If Tooley Wind is, through project operations, going to kill birds, in order to be in compliance with the Bird Act and the Eagle Act, they must obtain a permit or some other authorization from the Fish and Wildlife Service. So if they don't get, if they try to proceed and they don't, and a bird gets killed, then they're in violation of the Act, right? That is correct. Okay, and what you're saying is, if they're dumb enough to do that, that's their problem. That is correct. Okay. But I also, I also hear you saying that you're indifferent to whether they obtain the permit or not, that that's not your problem, that's their problem, even though the Department of the Interior, BLM, and your other client, Fish and Wildlife, know that there's going to be migratory birds killed by this project. Well, they don't know that migratory birds are going to be killed. The record talks about that. I know that. For what it's worth, I know that. I think everybody does. There's certainly a substantial risk. Other wind projects have taken birds, but both the agency and the industry has learned over the years. Older wind projects took far more birds than newer projects, and there's not a lot of birds in this area. And so there is, of course, risk, and Thule Wind can accept that risk and not apply for a permit. Why didn't you require them to get a permit? We did, we did require them, if they're going to take birds, to get a permit. Why didn't you make it a condition of the, you know, your study shows they're going to take birds. Why didn't you make it a condition that they get some approval from Fish and Wildlife? We did, Your Honor. At page 492, a condition of the right-of-way is that they must apply with all applicable laws and regulations, which would include the Bird Act and Eagle Act. It's in that general language, though, not as my colleague asked. The government acknowledges that there is no express condition precedent in the rod or elsewhere that says you've got to get a permit under the Migratory Bird Act or the Eagle, I forget the full name of the Eagle Act, but we all know what we're talking about here, the Eagle Act. What's the full name of it? Okay, one's going to call it the Eagle Act, but for the record, that's what it's called. Your Honor, there's, the record addresses this in two places, and in the right-of-way itself, the language used is the Thule Wind must comply with all laws and regulations, and all means all. That means the MBTA, that means the Eagle Act. Now in the record of decision, there is language at page 390 of the must obtain all necessary permits and approvals. So this is addressed in two places. Now what counsel from plaintiffs is talking about when they say that BLM discussed other statutes but not the MBTA, what they're talking about is the rod, where BLM said you must obtain all necessary permits. But in the right-of-way itself, they did not detail or spell out different statutes, it just says all laws and regulations, which would include the MBTA and Eagle Act. If BLM knew that the right-of-way was going to disturb endangered species habitat, would this language to comply with all laws? Hypothetically, you're going to plow, they're going to build on a, you know, well, endangered condor nesting area. We know it's going to affect habitat. Well, would your general language be good enough then? Yes, but if that were the case, there would have been some consultation under Section 7 of the Endangered Species Act here, but... That's because, is it not, because under the ESA there is a requirement for such consultation, whereas under the Bird Act and the Eagle Act, there is no such requirement and there's no express supervisorial responsibility on the part of the BLM, right? That's correct. Okay, so those are the differences there. So you fall back on the general law requirement, but you understand that in order to kill birds, if that unfortunate event were to happen, a permit is required or Thule is potentially seriously liable for a lot. Correct. Thule, if its operations are going to kill birds or eagles, they must obtain a permit or some other authorization from the Fish and Wildlife Service. What plaintiffs seem to be saying is they want this court to assume that Thule wind is going to violate the law at some point in the future by not obtaining authorization. I don't think courts make that assumption. Well, that's not our role. We don't make that assumption unless we know almost for a fact that it's going to happen. Right, and Thule Wind has worked with the Fish and Wildlife Service throughout this process and we assume Thule Wind will continue to work with. I think their concern is that as this is structured, the birds will be killed, then you'll get the permit. In other words, some birds are going to be killed as this is structured and that they think the first thing you should do is get the permit to kill the birds before you construct the towers. And of course, it's Thule Wind's choice to obtain a permit before operating. It's not BLM's responsibility to ensure Thule Wind's compliance with the law. BLM, for its part, in the right-of-way has required Thule Wind to comply with the law when operating the project or BLM reserves the right to revoke the right-of-way. That's at page 492 of the supplemental excerpts of record. So it's BLM's position that if Thule were to use the right-of-way to build these turbines and kill birds, that you could pull the authority you've granted there. I know you've got some people on the ground, or you're supposed to have people on the ground to examine this, and I think if one bird was killed, this is talking about your portion of it, if one bird was killed, that you'd meet to confer what can be done. If there's more than five, the whole thing shuts down. Is that correct? That's with respect to eagles, Your Honor. Oh, that's right. With respect to eagles, that's a condition of the protection plan, yes. Okay. The bottom line is, this is kind of Russian roulette, and the birds' lives are the ones that are the consideration. BLM's position is that it's Thule Wynne's responsibility to comply, not BLM's responsibility. Right, I get that, and I understand under the law why you say that. I'll be very interested to hear from our friends at Thule what they have to say about it when the time comes. Well, I will yield the remainder of my time to Mr. Wynne. Any questions you might call on for you? Okay, let's hear from Thule. Thank you, Your Honor. It's Daniel Brunton for Thule Wynne, LLC. A couple of very important points to make that really were not highlighted in the briefs or the oral argument so far. First one is, there is no permit available for Thule Wynne to obtain here. Typically, what has been done is the government exercises its prosecutorial discretion. It prefers to work voluntarily with good actors in the industry like Thule Wynne. Wait a minute. Maybe I misread the act, but I thought that the Migratory Bird Act expressly contained, contemplated, that if any kills were going to occur, that you could get a permit. It doesn't say how, I don't know where it is in the APA or anything like that, but it contemplates the existence of a permit. It does, it does, Your Honor. When you say no permit is available, what do you mean? And let me elaborate on that a little bit. So you will have seen in the regulations that were submitted with some of the papers that there are permits under the Bird Act, but they're typically directed at intentional take for things like falconry, things like that. The appellants have suggested that we could get a permit. The only one that would be potentially applicable would be the, what's called a special purpose permit. These are very rarely issued and hard to get. We're not aware of a single Wynne project ever having received such a permit. And even if we could, it wouldn't apply to this project. This is a 30-year project. By the express terms of the regulations, those permits are limited to three years. So there's, there's no permit available. And I would go to elaborate a little bit. The government's historical position has been that they use their prosecutorial discretion to sort of limit the scope of the Bird Act and apply it to bad actors. And they like to work voluntarily with industry to try to minimize bird deaths. Counsel, where does the three-year limitation on such a permit come from? First of all, you said there wasn't any. And then you said they have a three-year term. Where? Well, so what I mean by that is this is a 30-year project. Right, I get that. A three-year permit is... I'm asking, where does the limitation on the term of the permit come from? Oh, I'll have to get the site to the regulation for you, Your Honor. But that's... So you're saying there is a regulation contemplating the issuance of a permit? It's called a special purpose permit. Okay. And typically it's for things related. But let me get to a second point, which is equally as important, I believe. Fish and Wildlife Service actually began a rulemaking in 2015, understanding that there is a lot of uncertainty out there. All sorts of things in modern life can kill birds, can foreseeably kill birds. Buildings, highways certainly, ownership of pets, wind turbines, although wind turbines are a small... Windows at a high altitude that look like a mirror, look like there's landing into a lake. All sorts of things, Your Honor. Oil operations in the And those oil operators were pursued with civil and criminal penalties, too. They were. They were. And that's typically how the government has used its enforcement discretion to keep the bird act from being completely unbound, unlimited. There's not... But Thule would be subject to prosecutorial discretion. It would be subject to prosecutorial discretion. There is risk. We acknowledge that. Let's take your position. I'm not sure I agree with it, but just say you're right. Yes. If you build the turbines and you don't get a permit and birds are killed, why couldn't these folks get an injunction stopping your operation on the basis that you have no permit under the Bird Act or the Eagle Act and you're killing birds? That could be something that they could look at doing then. I think more... Why would you want to take that risk? And we don't. We don't want to take that risk. I guess that's what I don't understand, counsel. I mean, I understand the niceties of the whole thing, and I get your point about the three years, but... Frankly, it puts developers in a tough situation. Why would you not want to say, look, we want to comply. We want a permit. I agree, Judge Smith, and that actually ties into the rulemaking that the Fish and Wildlife Service is doing now. First point I want to make on that before turning to the substance of it is in this rulemaking, and it's ADFR-30032 is the notice of rulemaking. I'm sorry. What was it again? It was ADFR-30032, and we can submit that site report afterwards, too. The Fish and Wildlife Service specifically says in their rules, their proposed rules, government agencies acting in their regulatory authority, BLM here, are not going to be able to... not going to be required to get a permit consistent with the government's position since the inception of the Bird Act in 1918. So this is a really novel claim that they're arguing. But to get to the risk and the substance of it a little bit... That's a treaty, isn't it? Mexico and Canada are going to start to wonder. The MBT, the Migratory Bird Treaty. How can the Fish and Wildlife say we're going to ignore an international treaty that requires a permit before you can do kills? Well, but I don't think any court has held that it requires the government acting in its regulatory authority to get a permit. There's always the future. There's always the future, but I would point... Judge Smith, I would point you to this court's decisions interpreting the Bird Act. There aren't many, but it's clear that it applies to direct activity, not to indirect activity. But here we have basically a brave new world. I don't know exactly when these turbines began, but certainly not more than 25 years ago. So it's relatively new, certainly after the advent of the Bird Act, and maybe the Eagle Act as well. So you've got these huge devices, and many people think they're wonderful because it generates electricity without hydrocarbons or anything like that, and it's supposed to help in a lot of ways. You've got this tug-of-war going back and forth. How can this not take into consideration the impact on birds and not get permits involved? Oh, and it did take into... Let me give a two-part answer. First, the Fish and Wildlife Service was intimately involved with this. There were surveys done since 2004. No, we see those in the record, yeah. And I would just emphasize, too, the ongoing involvement of Fish and Wildlife Service. But I would turn again to this rulemaking. There will be permits available, perhaps required, for a variety of industries, including possibly the wind energy industry. As soon as that permit's required, we're already required to comply with applicable law, so I would assume that we would. I understand. So for our purposes, let's just assume that we have your positions, we've understood those, we get the position of the plaintiffs that, under the law, you can't kill these birds without a permit. They don't want you to kill any of them, but you certainly can't kill them without a permit. The government says, we're not in the business of doing that. That's Thule's problem. We've complied with the law. We've complied with NEPA. Everything's been disclosed. Everything's been investigated. So now it all comes down to Thule. You have a right of way. You can do certain things, but there's no express right to kill migratory birds or eagles. So you are at risk. When we write an opinion, if we say what I just said in more complete language, do you agree that in construing the language that you and the BLM have cited about compliance with federal, state, and local law, that the court understands and assumes that you and all people understand that part of that requirement under current law is that you've got to get a permit? Do you agree with that? No, I don't, Your Honor. Well, you're just relying on it. You're saying, don't worry, Judge, because the law says you've got to do this. I actually thought we would get a little bit more into Seattle Audubon Society and the city of Sausalito today, but the district courts in this circuit have interpreted the Ninth Circuit's case law as actually not applying to this sort of unintentional take of birds altogether. That said, truly, I've talked to my client. If a permit is available, they will get it. They will apply for it. And they actually submitted a comment letter to the Fish and Wildlife Service encouraging them to go forward with this rulemaking and to eliminate some of the regulatory uncertainties. So basically, from your perspective, unintentional takings don't count. And your position is that if they say that you have to comply with all the laws and the laws say it doesn't count, then you're okay. Well, frankly, we were in a gray area that we would be taking some risk because we would face we know with a certainty the government doesn't agree with how the district courts have interpreted the Ninth Circuit case law. They think unintentional takings do count. So the permit program that is being written now by Fish and Wildlife Service will help and help settle this area. There are no appellate cases that agree with that concept, are there, that unintentional takings don't count? Oh, there are. The CITGO opinion that we submitted, there's actually several district court opinions, including Judge Sammartino. And I acknowledge that the different circuits, there is a split among the circuits, but the Ninth Circuit seems to have said that unintentional takings don't count, and that's certainly how the district courts. But our court didn't say that. It's the district courts, right? That's, I'm saying the district courts have interpreted the Ninth Circuit in the city of Sausalito and Seattle, Ottawa. I mean, there's a basis for it. You're going to take birds, you intend to do it, and you apply for permits so that your taking can be regulated. You build a turbine, sometimes after that legislation, you build a turbine and you discover that, yes, you're killing birds, but you never wanted to kill birds. That's exactly right, Your Honor. You want the birds to keep flying, but you inadvertently kill them, and there are those who would say it's unavoidable. You have to know that you're going to kill them if you elect. And that may actually be a good point for me to end on. It's not just Thule that doesn't have a permit available. If appellants get the relief they're seeking tomorrow, wind energy on federal lands comes to a stop. Renewable energy on federal lands comes to a stop. But it's not just renewable energy and wind energy. It's anything with a federal nexus where there's foreseeable death of birds, which is the standard that they're articulating. Highways can kill birds. There's no permit available under the MBTA for permits. Okay. Thank you for your argument. You have a little time left here. Thank you, Your Honor. Thank you all. I'm going to use it profitably, Your Honor. It's simply not accurate what counsel said. 50 CFR section 21.27 specifically provides for special purpose permits. It has a three-year duration, which could be renewed at the 50 CFR section 21.27. They could apply for that permit tomorrow. It has a term limit, but under section D it can be extended. By the Fish and Wildlife Service at the Fish and Wildlife Service's discretion. The service has specifically said when it adopted that regulation, 72 Federal Register 8947, that it was put out in part so that there could be a permit for the take of migratory birds that results from an unintended consequence that they anticipate will occur that's foreseeable. There is a permit right now. It's correct that there's a new permitting process that's being put out, which will probably be in place in the near future. But this exists today, and they could apply for it today. If I could just make two more quick points, Your Honor. So this will not stop wind power. They could apply for it. And, in fact, there hasn't been a permit granted specifically to an agency in exactly the context that counsel said doesn't exist. If you look at 77 Federal Register 50153, that's a permit issued as special purpose permit in 2012 to the National Marine Fishery Service for regulating long-line fishing, which, like wind power, predictably and inexorably results in some deaths of migratory birds, even if it's not the purpose of the activity. So we have an example of it being granted. Wind power projects can apply for it at any time. Now, finally, in terms of the Seattle case and Seattle Audubon and other court precedent, that case specifically cited They can apply for it, but in their view, the law doesn't require them to apply for it at this juncture because they don't intend to kill any birds. Right. All the killing is going to be unintentional. And I suppose your point is everybody knows that you put this turbine at the height you're going to put it. It's going to interfere with migratory birds. Without any doubt, as soon as the sun will come up tomorrow, another project in California kills 68,000 birds a year. You know what? And we aren't going to decide the case on this basis, but you will kill birds initially, but birds will learn to fly over those things. We hope that there are things that happen down the road. Right now we know what will happen. If I could simply finish on this precedent point, Your Honor. Yeah, very quickly. Seattle Audubon cited with approval, and it was before Your Honor was ruling in the Tenth Circuit case, which came down the same way, but cited with approval other cases which have said that where it's proximate because it's foreseeable, that it's an ultra-hazardous activity that cannot be done without killing birds, then that is covered by the Migratory Bird Treaty Act. That's what Seattle Audubon said. There's no conflict that the court has to recognize. It's already in the court's precedent. We're not talking about habitat modification that's indirect. We're talking about direct killing of birds, which the precedent supports as covered, as well as the court's precedent. The Fifth Circuit case does go the other way. They do, Your Honor. We disagree with it, and we think the court's precedents are not consistent with it, as well as Your Honor's ruling. It is. There's our circuit split. It happens. Thank you all. Thank you. Your Honor, may I have one minute? Well, to be fair, go ahead. Sure. It's an important case, so one minute. Just as special use permits are provided in the law for this exact situation, as has been cited, 50 CFR Section 2127, so too EGLE Act take permits are specifically provided for in the law. That appears at 74 Fed Reg at 46842 to 843. 74 Fed Reg. What was the site? 46842 to 843. That's where the Fish and Wildlife Service confirmed that EGLE take permits are available to federal governments as well as others specifically for wind farm operators. That appears in the record here at ER 1626 to 27, and the regulatory site for that is 50 CFR Section 22.3, which establishes the standards for EGLE take permits. Okay. And then finally. I think we've used up your minute there. I can give you the site on Seattle Audubon. I appreciate that, but I think we're in good shape. Thank you. Thanks to all counsel for their argument. Very helpful. We recognize this is an important case. It, of course, involves a great deal of complication, but it involves important issues. We appreciate your sincerity, your hard work, and we will do our best. The case just argued and submitted in the court for today stands in recess.
judges: Tymkovich, Farris, M. Smith